**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BARBARA REES,                          )
                                       )
                    Plaintiff,         )
                                       )        Case No. 1:09-cv-283
        v.                             )
                                       )
OFFICE OF CHILDREN AND                 )
YOUTH, *et al.*,                       )
                                       )
                    Defendants.        )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District J.,

        This civil action arises from events involving the Plaintiff's unsuccessful attempts

to obtain custody of her two minor grandchildren following the death of her son, who

was the children's biological father.  Plaintiff Barbara Rees has asserted a cause of

action under 42 U.S.C.  § 1983 for the alleged violation of her federal civil rights as well

as various claims premised on Pennsylvania tort law.  She has named as Defendants

the Erie County Office of Children and Youth ("OCY") and several of its employees

and/or agents.

        The case was originally commenced in the Erie County Court of Common Pleas

and removed to this Court pursuant to 28 U.S.C. § 1441.  This Court has subject matter

jurisdiction over the case pursuant to 28 U.S.C. §§ 1331, 1343(a) and 1367(a).

        Presently pending before me is the Defendants' motion to dismiss the complaint

pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be

granted.  For the reasons that follow, the motion will be granted insofar as it relates to

Plaintiff's federal claim under § 1983.  As to the remaining state law claims, this Court

will decline to exercise supplemental jurisdiction and will instead remand those claims

for further proceedings in state court.

1

# I. FACTUAL BACKGROUND

Pearl Dombrowski ("Pearl") and Ruby Peterson ("Ruby") are the minor children of Carrie Peterson ("Peterson") and Joseph Dombrowski, who is now deceased. (Complaint ¶¶ 1-2.) Plaintiff Barbara Rees ("Rees") is the mother of Joseph Dombrowski and the paternal grandmother of Pearl and Ruby. (*Id*. at ¶ 4.) Defendants Karleen Vogt ("Vogt") and Cyndi Valimont ("Valimont") were employed at all relevant times by OCY as, respectively, a caseworker and a supervisor. (*Id*. at ¶¶ 8, 11.) Defendant Amy Jones, Esq. is an assistant solicitor for the County of Erie who represented OCY in matters pertinent to this litigation. (*Id*. at ¶ 14.)

On or about April 5, 2007, Defendant OCY began an investigation of alleged neglect on the part of Pearl and Ruby's biological mother, Peterson. (Complaint ¶ 20.) Three months later, in July of 2007, the children were taken into custody by OCY and placed into a foster home as the result of a judicial determination that continued placement in Peterson's home would be contrary to the children's welfare. (*Id*. at ¶¶ 21-22.)

Prior to these events and the involvement of OCY, Pearl had spent significant time with Rees and, with the agreement of her biological parents, had been cared for by Rees over a period of seven months. (Complaint ¶ 18.) During this same period of time, Peterson had denied Rees custody over Ruby on the ground that she did not believe Joseph Dombrowski to be Ruby's biological father. (*Id*. at ¶ 19.)

On August 4, 2007, shortly after the children had been placed into an OCY foster home, Joseph Dombrowski died unexpectedly. (Complaint ¶¶ 21, 24.) On or about that date, genetic tests were taken by the Domestic Relations Section of the Erie County Court of Common Pleas. (*Id*. at ¶ 25.)

A few days later, a court hearing was held concerning a Dependent Child Petition filed by OCY on behalf of the children. (Complaint ¶ 26.) At this hearing, Rees notified Defendant Jones and OCY that she wished to assume the responsibilities of her deceased son and care for the children. (*Id*. at ¶ 27.) In addition to Rees, several

members of the children's biological family advised OCY that they wished to care for and/or adopt Ruby and Pearl. (*Id*. at ¶ 28.) Defendants nevertheless refused to allow Rees or other family members to care for or adopt the children on the ground that the paternity of the children had not been officially determined. (*Id*. at ¶ 29.)

On or about November 29, 2007, the results of the genetic tests revealed Joseph Dombrowski to be the biological father of both Pearl and Ruby. (Complaint ¶ 31.) Rees was then granted permission to visit the children each week for a period of one hour at the home of the foster parents. Later, these visits were expanded to include activities outside of the foster home for a period of up to one and one-half hours, including travel time. (*Id*. at ¶¶ 32-33.)

On December 12, 2007, Rees completed an Emergency Caregiver Kinship Authorization and Consent form and delivered the same to OCY. (Complaint ¶ 34.) Rees was subsequently notified by Defendants Vogt and Valimont that her form would remain on file and that the children would be placed with her only if they were not reunified with their biological mother. (*Id*. at ¶ 35.)

On or around January 29, 2008, Rees's then-attorney, James Geronimo, Esq., sent correspondence to Defendant Jones and OCY requesting increased visitation time and reiterating Rees's willingness and ability to take over the care of the children. (Complaint ¶¶ 36-37.) Following this request, Vogt and OCY terminated Rees's weekly visits with the children without stating any reason. (*Id*. at ¶ 38.)

Two months later, in March of 2008, Valimont and Vogt advised Rees that her weekly visits would be reinstated under the conditions that they occur at the convenience of the foster parents and that they not exceed two and one-half hours. (Complaint ¶¶ 40-41.) Thereafter, Rees sought overnight visits with the children but was informed by Vogt that such visits would not be allowed as they would interfere with the reunification process between the children and Peterson. (*Id*. at ¶¶ 42-43.) Notwithstanding this, the children's foster mother gave Rees verbal approval of her request and indicated that Peterson had never made any attempt to see the children.

3

(*Id*. at ¶ 44.)

On or around July 7, 2008, Rees was notified by OCY that the reunification process between the children and their mother had been terminated. (Complaint ¶ 45.) That same day, Defendant Valimont telephoned Rees about her interest in pursuing the Kinship Care process, and the process was re-initiated two days later on July 9. (*Id*. at ¶¶ 46-47.) In spite of the kinship care process having been renewed, Plaintiff was notified later that month by the children's foster mother that OCY had informed her it would require agency approval for each of Rees's visits with the children. (*Id*. at ¶ 48.)

On or around July 28, 2008, the Court of Common Pleas entered an order involuntarily terminating Peterson's parental rights. (*Id*. at ¶ 49.) At that hearing, the children's guardian ad litem recommended that the children be placed with Rees as next of kin; however, Defendant Vogt recommended adoption by the foster parents on the ground that the children's father, who had been raised by Rees, had committed suicide. (*Id*. at ¶¶ 50-52.) Notwithstanding these events, Rees's Kinship Care application was approved on or around August 28, 2008 (*Id*. at ¶ 53.)

Approximately two weeks later, Rees filed a formal grievance against OCY with Mary Ann Daniels, Director of the Erie County Department for Human Services, Office of Children and Youth Services. (Complaint ¶ 54.) The following day, Rees learned that OCY was cancelling her weekly visits with the children and that it had instructed the children's foster mother not to allow Rees any contact with them. (*Id*. at ¶ 55.) Rees avers that this action was taken in retaliation for the formal grievance she filed against the Defendants. (*Id*. at ¶ 56.) This cancellation of visits occurred notwithstanding Defendants' awareness that Rees was eligible to care for the children and that her kinship care application had been improved. (*Id.* at ¶ 57.) On or around September 22, 2008, OCY transferred responsibility for the matter to a new caseworker, Greg Phillips. (Complaint ¶ 58.)

The following month, Rees filed a second formal grievance against the Defendants, this time with the United States Department of Health and Human

4

Services, which forwarded the grievance on to the Pennsylvania State Office of Children, Youth and Families.  (*Id*. at ¶¶ 59-61.)  By e-mail dated October 30, 2008, Ms. Daniels acknowledged that OCY had been directed to facilitate visitation with Rees and expressed her own uncertainty as to the reason for the "hold-up."  (*Id*. at ¶ 62, Ex. E.)

On or around November 3, 2008, Rees received a letter from the Director of OCY stating that she had been selected for "random" urine screens for drugs and alcohol requiring her to call the office every day of the week starting immediately to see when she would have to submit to these tests.  (Complaint ¶ 63.)  The following day, Rees received an email from Cyndi Gariepy, Program Representative, Pennsylvania State Department of Public Welfare, indicating her concern that "[t]his case was handled very poorly by the agency."  (Complaint ¶ 64, Ex. F.)

On or around November 17, 2008, Rees was advised that, as the result of an investigation of OCY at the state level, her case would be assigned to a new caseworker, Nicole Duplanti, and a new supervisor, Kim Warchol.  (*Id*. at ¶ 66.)  Rees was further advised that she would have to once again recommence the process of submitting to a home study and undergo additional daily "random" drug screening.  (*Id*. at ¶ 67.)  Rees ultimately chose not to participate in the second home study based on her frustration with the process and her treatment by the agency.

Following a "lengthy and thorough review" of OCY's actions by the Pennsylvania Department of Public Welfare, Western Region Office of Children, Youth and Families, the latter agency issued a report of its findings as set forth in correspondence dated January 2, 2009 and appended to the Complaint.  (Complaint ¶ 68, Ex. G.)  That report states, in relevant part, as follows:

> The agency removed the children from their mother on July 27, 2007, and placed the children into an approved foster home.  On July 30, 2007, the father of Pearl contacted the agency and requested his mother be considered as a placement resource.  On July 31, 2007, the paternal grandmother, Ms. Rees, attended the court hearing and requested consideration for kinship approval.  The agency failed to consider the grandmother until a paternity test was completed on both children, even though Ms[.] Rees had previously cared for Pearl for seven months.  It was not until December 2, 2007, that paternity was verified.  A formal

5

kinship referral was not submitted to Family Services until July 9, 2008. Ms. Rees was approved on August 28, 2008. After approval, the children's goal was changed to adoption and all visits were stopped between the children and their grandmother. The agency's plan was to recommend the foster parents adopt the children as they had "developed a bond". Although the grandmother was approved, there was no motion by the agency to move the children, as the bond had already formed between the children and the foster parents.

     The Department finds the actions of the agency a direct violation of the Kinship Care Policy and the Adoption and Safe Families Act of 1997. There was no requirement of paternity necessary prior to consideration of Ms[.] Rees as a kinship resource. The agency's failure to conduct an appropriate and immediate kinship study severely disrupted any bond that would have formed between the children and their grandmother.

(Complaint Ex. G.)

Rees alleges that, despite their awareness that several members of the children's biological family wished to care for and/or adopt the children, the Defendants refused to allow herself or any other member of the children's family to adopt or care for them and instead "adamantly and aggressively opposed placement of the children with [her] in favor of the foster parents." (Complaint ¶¶ 28-29, 91.) This refusal of access, she claims, was without any reasonable basis and in contravention of Defendants' duty, pursuant to the Kinship Care Policy adopted by the Pennsylvania Department of Human Services and the Adoption and Safe Families Act of 1997, to "make reasonable efforts and document child specific efforts to place a child for adoption, with a relative or guardian." (Complaint ¶¶ 30, 74, 77, 88-90, 92.) She further claims that, "[t]o date, the bond and relationship between [herself] and her grandchildren remains irreparably damaged" due to the Defendants' actions. (*Id*. at ¶ 83.)

As a result of the foregoing, Rees has alleged several claims premised on the violation of her rights or duties owed her under state and federal law. Counts I and II assert claims under 42 U.S.C. § 1983 for the alleged violation of her federal civil rights. Counts III and V assert state law claims for negligence and gross negligence, respectively. Count IV asserts a claim for negligence *per se*, based on alleged violations of the Adoption and Safe Families Act of 1997. Counts VI and VII assert

respective state law claims for the alleged negligent and intentional infliction of emotional distress. Count VIII asserts a claim for municipal liability against OCY pursuant to 42 U.S.C. § 1983.

Defendants have filed a motion which requests, among other things, that this Court dismiss all of the federal § 1983 claims on the basis that they fail to state a cognizable cause of action upon which relief can be granted. Plaintiff has filed a brief in opposition, and the issues are now ripe for disposition.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010) (*quoting Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 523 (3d Cir.2009)). Moreover,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks and alterations omitted).

## III. DISCUSSION

### A.

Counts I, II, and VIII all involve claims brought under 42 U.S.C. § 1983 to redress alleged violations of Rees's federal civil rights. That statute provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights; instead, it "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Gordon v. Lowell*, 95 F. Supp. 2d 264, 268-69 (E.D. Pa. 2000) *(quoting Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996)). Therefore, a plaintiff asserting a claim under § 1983 must establish both: (1) the deprivation of a right secured by the United States Constitution or federal law, and (2) that the alleged violation was committed by a person acting under color of state law. *Id*. Here, there is no dispute about the latter requirement, but the first is contested.

In Count I of the Complaint, Rees alleges that the Defendants have violated her constitutionally protected rights to privacy, familial association and integrity, and the maintenance, custody, care, and management of her grandchildren. In Count II, she alleges that Defendants violated her constitutional right under the Due Process Clause to equal access to the courts. Rees's theory of liability also incorporates allegations that the Defendants conspired together to deprive her of these rights. Counts I and II appear to be premised, respectively, on the Fourteenth Amendment's substantive and procedural guarantees against "depriv[ations] ... of life, liberty, or property, without due process of law." [1] U.S. Const. amend. XIV, § 1. We consider each count in turn.

---

[1] Although Rees makes passing reference in her brief to the First Amendment's guarantee of intimate family association, we construe this claim as one more properly analyzed consistent with the Fourteenth Amendment's due process guarantees. The First Amendment guarantees the right to "[t]wo sometimes overlapping types of protected association," *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3d Cir. 1988), to wit: "associations founded on intimate human relationships in which freedom of association is protected as a fundamental element of liberty, and associations formed for the purpose of engaging in activities protected by the first amendment, such as the exercise of speech, assembly, and religion." *Id*. (*citing Roberts v. United States*

1.    Count I of the Complaint

        Where, as here, liberty interests are asserted as a basis for § 1983 liability, the court must initially address the "threshold issue" of "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *McCurdy v. Dodd*, 352 F.3d 820, 825-26 (3d Cir. 2003) (internal quotations and ending citations omitted). *See also Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir.2000) (en banc) (citation omitted). The Supreme Court has observed that the liberty interests of parents in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65. Rees contends that she enjoys that same constitutional protection relative to her grandchildren. Count I of her complaint may be understood as asserting three variations of this purported liberty interest:  (i) Rees's interest in directing the upbringing (*i.e.*, "maintaining custody, care and management") of her grandchildren; (ii) her interest in keeping her extended family intact (*i.e.* "family integrity") and (iii) her interest in enjoying the companionship of her grandchildren (*i.e.*, "family association"). (*See* Complaint ¶ 98.)[2]  To properly determine whether Rees has alleged the deprivation of an actual constitutional right, it is necessary to review the

_____

*Jaycees*, 468 U.S. 609, 617-18 (1984)). Rees's claims entail only the first type of protected association – those "founded on intimate human relationships in which freedom of association is protected as a fundamental element of liberty." *Id*.

        [2] Although Rees also asserts that Defendants have infringed upon her "constitutional right to privacy" (*see* Complaint  98), I do not view this allegation as implicating a distinct constitutional right. The Supreme Court has acknowledged, in a long line of cases, that the "liberty" interests protected by the Due Process Clause include the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing cases). Yet the Court has also noted that these fundamental rights are "not simply deduced from abstract concepts of personal autonomy," id. at 725, and the fact that "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Id*. at 727. Thus, I do not construe Rees's claims as invoking a constitutional right to privacy separate and distinct from the family-related liberty interests which serve as the basis of her due process claim.

9

existing case law discussing and defining the constitutional rights of grandparents vis-a-vis their grandchildren.

We begin with *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), a case in which the Supreme Court struck down a housing ordinance that restricted occupancy of a dwelling unit to single families while defining "family" in such a way that the appellant, Inez Moore, could not lawfully reside with her son and two grandchildren (who were first cousins to each other).[3] En route to its ruling, a plurality of the Court rejected the City's position that any constitutional right to live together as a family should extend only to a couple and their dependent children, stating:

> Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. [ ] Over the years millions of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. Decisions concerning child rearing, which *Yoder, Meyer, Pierce* and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household – indeed who may take on major responsibility for the rearing of the children. [ ] Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life. This is apparently what happened here.[ ]

> Whether or not such a household is established because of personal tragedy, the choice of relatives in this degree of kinship to live together may not lightly be denied by the State. *Pierce* struck down an Oregon law requiring all children to attend the State's public schools, holding that the Constitution "excludes any general power of the State to standardize its children by forcing them to accept instruction from public

---

[3] One of the appellant's grandchildren, who had come to live at the residence following the death of his own mother, was deemed an "illegal occupant" and appellant was criminally charged with violating the ordinance after failing to remove him from her home.

teachers only." ...  By the same token the Constitution prevents East Cleveland from standardizing its children and its adults by forcing all to live in certain narrowly defined family patterns.

*Id*. at 504-06 (footnotes and internal citation omitted).

Rees argues that the Supreme Court's decision in *Moore* "carved out rights of familial integrity and privacy for grandparents and other non-traditional family types." (Br. in Opp. of Def.s' Mot. to Dismiss Compl. [9] at p. 8.)  Yet such a reading overstates *Moore's* central holding.  The narrow question resolved in *Moore* was the constitutionality of a city housing ordinance that, on the basis of land-use concerns, "intrude[d] on choices concerning family living arrangements."  431 U.S. at 499.  Neither matters of child welfare nor rights involving non-resident grandparents were at issue.

While the Third Circuit Court of Appeals has not defined the substantive due process rights of grandparents and other extended family members relative to custodial matters, several other federal circuit appeals courts have addressed this issue.  In the cases which have been decided since *Moore,* courts addressing the purported due process rights of grandparents and other extended family members seem to place particular emphasis on several factors:  *to wit*, whether the plaintiff is a custodial figure or is otherwise acting in loco parentis to the children; whether and for how long the children were residing with the plaintiff at the time of the alleged deprivation; whether the plaintiff has a biological link to the children; and whether there is a potential conflict between the rights of the plaintiff and the rights or interests of the children's natural parents.  Some courts have also considered whether relevant state law would imbue the plaintiff with certain rights or expectations typically afforded to parents.

In *Ellis v. Hamilton*, 669 F.2d 510 (7th Cir. 1982), the Seventh Circuit Court of Appeals considered the due process claims of plaintiffs Amy Ellis and Zella Frazier, who filed suit after various county welfare agents commenced proceedings that led to the removal of minor relatives from their homes and the children's eventual adoption by strangers.  Mrs. Frazier was the natural mother, and Mrs. Ellis was the natural aunt, of

the children's father, Larry, who had been adopted by Mrs. Ellis as a child. Thus, Mrs. Frazier was the children's biological paternal grandmother, and Mrs. Ellis was the children's adoptive (and legal) grandmother. After Larry and his wife proved to be unfit parents, their four children were taken in and cared for at various points by the plaintiffs. At the time of the alleged wrongdoing, two of Larry's children resided with Mrs. Ellis and two with Mrs. Frazier. The plaintiffs alleged that, after initially consenting to this placement, the defendant welfare officers had ordered the plaintiffs to surrender the children on two days' notice and without any explanation, after which time the children were placed in unsuitable foster care settings. It was further alleged that, following the termination of Larry's and his wife's parental rights, the defendants arranged for the adoption of the children by private parties and obstructed the plaintiffs' participation in those proceedings.

In considering the viability of the plaintiffs' claims on motions for summary judgment, the court began with the premise that "[i]t is plain... that the 'liberty' protected by the due process clause of the Fourteenth Amendment includes the right to the custody of one's minor children and that it would be a deprivation of that liberty without due process of law for persons acting under color of state law permanently to separate the children from their parents without notice and hearing." *Ellis*, 669 F.2d at 512. However, the court found no similar right on the part of Mrs. Frazier, noting that "[t]he interest of a natural grandmother in grandchildren born long after their parent was adopted away seems too tenuous to be part of the liberty protected by the due process clause." *Id*.

The *Ellis* court then went on to consider the liberty interests of Mrs. Ellis herself, noting that, while her liberty interest was stronger, the court was "not sure that even it should be accepted." *Id*., 669 F.2d at 512. Bypassing the fact that Mrs. Ellis was not a biological grandparent, the court considered the "more fundamental" question "whether even a natural grandparent's interest in the society of her grandchildren, though an interest rooted in powerful emotions, is a liberty interest under the due process clause."

12

*Id*. at 513. The court declined to definitively rule out such a possibility, despite what it termed "the absence of compelling authority" to support such a liberty interest. *Id*. Although the court doubted that this kind of liberty interest could exist where the grandchildren remain in their parents' custody, 669 F.2d at 513, it distinguished Mrs. Ellis's situation, crediting the allegation that Mrs. Ellis had been *in loco parentis* to her grandchildren at the time the defendants took them away from her. *Id*. Under such circumstances, the court stated, it was "reluctant to conclude that a great-aunt, an adoptive grandmother, and a de facto mother and father all rolled up into one does not have a liberty interest sufficiently like that of a parent to support an action under section 1983." *Id*. Key to the court's analysis was the fact that Mrs. Ellis claimed to have had formal custody of her grandchildren when the defendants took them from her home. "As custodians," the court reasoned, the plaintiffs "might well have had a right of action if the children had been tortiously injured or killed while living with them ..." *Id*. at 514. Thus, the *Ellis* court was prepared to assume the existence of a constitutionally protected liberty interest on the part of Mrs. Ellis relative to the continued custody and maintenance of her grandchildren. Nevertheless, it went on to hold that no due process violation had occurred because Indiana law provided adequate remedies for the correction of any errors which had occurred in the course of the legal proceedings. *See generally* 669 F.2d at 514-16.

The Second Circuit recognized a constitutionally protected liberty interest on the part of a biological relative in *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir. 1982), where the plaintiff was a half-sister to the children in question and had assumed care for them in her own home at the request of their mentally ill mother and pursuant to a foster care agreement. While recognizing that foster parents generally do not enjoy the same liberties as natural parents vis-a-vis the children in their care, the Second Circuit nevertheless concluded that the plaintiff, Dorothy Rivera, was more akin to a natural parent, given the fact that she was principally responsible for the care and upbringing of the children for a number of years, and had been since their infancy, prior to the state's

involvement.

Citing to the Supreme Court's decision in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816 (1977) – a case addressing the due process rights of foster parents, the *Rivera* court noted that foster parents typically are not afforded constitutional protection relative to their relationships with their foster families due to three considerations:  first, there is usually no biological link between the foster parent and the children in their care; second, the source of the foster family relationship is a contract whereby the  parties' rights are "carefully circumscribed by the state," 696 F.2d at 1024, and third, there is "virtually unavoidable tension" between the protection of the natural parents' liberty interests on one hand and the extension of familial rights in favor of foster parents on the other.  *Id*.  The *Rivera* court noted that the case before it was distinguishable from the typical foster removal case, however, inasmuch as (i) Mrs. Rivera was biologically related to her half-siblings; (ii) they had lived together as a family for several years prior to a foster care agreement being consummated; and (iii) there was no potential for conflict with the rights of the natural mother, as she had shown no interest in the children for 12 years, was in a mental institution, and was likely to remain there.  *Id*.  "In these circumstances," the court found, "Mrs. Rivera possesse[d] an important liberty interest in preserving the integrity and stability of her family."  *Id*. at 1024-25.  The court went on to state that "custodial relatives like Mrs. Rivera are entitled to due process protections when the state decides to remove a dependent relative from the family environment," *id*. at 1025, and, in fact, the court found Mrs. Rivera's situation virtually indistinguishable from that of the plaintiff grandmother in the *Moore* case.  Citing other relevant considerations, such as "the expectations of the parties at the time the [foster] relationship was commenced" and "the age and previous living experience of the children prior to entering the foster care environment," *id*. , the court found that these factors also weighed strongly in favor of extending due process protection to the plaintiff, since she had cared for the children almost from birth, had continued to act as their "surrogate mother" after their natural

14

mother was institutionalized, and had assumed responsibility for them well before the foster care agreement was consummated.

In a case distinguishable from *Rivera*, the Ninth Circuit Court of Appeals held that a biological grandmother had no constitutional interest in the adoption or society of her grandchildren where the grandmother had only maintained occasional contact with her grandchildren and lacked any emotional, financial or custodial history with them.  In *Mullins v. State of Oregon*, 57 F.3d 789 (9th Cir. 1995), the subject children were dependents of the state of Oregon when the plaintiffs (the grandmother and her husband) sought, unsuccessfully, to adopt them.  Notwithstanding the plaintiffs' assertion that they possessed a constitutional right to keep their "family" intact, the court of appeals stated that the case was "[not] about breaking up an extant family unit," but rather "creating a new family unit where none existed before."  57 F.3d at 794.  On the facts before it, the court found that the plaintiff grandmother was identical, in every material respect, to every other "prospective adoptive parent," save for her biological link.  The court distinguished the ruling in *Moore v. City of East Cleveland, supra,* stating that "[a] negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth."  *Id*.  It further stated that it was unaware of any authority "supporting the proposition that a grandparent, by virtue of genetic link alone, enjoys a fundamental liberty interest in the adoption of her grandchildren" for purposes of establishing a substantive due process claim.  *Id*.

The *Mullins* court went on hold that the grandmother lacked any protected liberty interest for purposes of a procedural due process claim.  Here, the court noted, the liberty interest at stake need not be "fundamental," since the procedural component of due process protects "all liberty interests that are derived from state law or from the Due Process Clause itself."  57 F.3d at 795.  The court, however, found no basis to support the plaintiffs' asserted liberty interest whether under statutory, administrative, or common law.  *Id*. at 795-96.  It concluded that "grandparents *qua* grandparents have no

15

constitutionally protected liberty interest in the adoption of their children's offspring." *Id*. at 797.

The Ninth Circuit subsequently revisited the issue of grandparents' substantive due process rights in *Miller v. California*, 355 F.3d 1172 (9th Cir. 2004). The plaintiffs in *Miller* were the paternal grandparents of three young girls who had been removed from their parents' home by county welfare workers and subsequently declared dependents of the court. They were initially placed with the plaintiffs and remained there for a period of over two years until the children were removed from the plaintiffs' home in connection with efforts to reunify them with their mother. Thereafter, an investigation arose concerning possible sexual abuse committed by the plaintiff grandfather, and the plaintiffs' visitation rights were terminated. Eventually, after the case was transferred to another county, the mother resumed her neglectful ways and the plaintiffs again assumed the role of de facto parents and guardians of the children, taking custody of them for a period of years. After the plaintiff grandfather's name was placed on the State's Child Abuse Central Index in connection with the previous abuse investigation, the plaintiffs filed suit, asserting that the transferor county and certain of its officials had conspired to deprive them of their due process right to family integrity and association with their grandchildren.

The *Miller* court held that the plaintiffs possessed neither a substantive due process right to family integrity and association relative to their grandchildren nor a liberty interest in visitation with them. As to the right of family integrity and association, the court observed that "there was no existing family unit of which [the plaintiffs] were a part that Yuba County sought to break asunder; the grandchildren were, in fact, wards of the court at all relevant times." 355 F.3d at 1176. The court also found it significant that the plaintiffs' interests in that case conflicted with those of the girls' mother and maternal grandmother, both of whom were also seeking custody of the girls. Distinguishing the case from *Moore*, the *Miller* court concluded that "there was no basis for holding that the Millers had a substantive due process right to visit their

16

grandchildren when those children were dependents of the court, and CPS and the children's biological mother agreed that visitation should cease." *Id*. Nor did the court consider the plaintiffs' status under California law as "de facto parents" sufficient to create a constitutionally protected liberty interest in contact with the children. Noting that it was "appropriate to ascertain from state law the expectations and entitlements of the parties," 355 F.3d at 1176 (quoting *Smith, supra*, 431 U.S. at 845-46), the *Miller* court observed that California law affords de facto parents – defined as those who, "on a day-to-day basis, assume[ ] the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care," *id*. (citation omitted) – "only the right to be present, to be represented and to present evidence in a dependency proceeding." *Id*. (citation omitted). Because the plaintiffs' status as de facto parents "conferred no other, or weightier interest of constitutional dimension," *id*., other than their right to appear at the dependency hearings -- a right which had not been denied them, the *Miller* court concluded that they had not established the deprivation of any constitutional right. *See id*. at 1176-77.

The First Circuit Court of Appeals has similarly expressed doubt as to whether non-resident grandparents have a constitutionally protected interest in their grandchildren under substantive due process principles. In *Brown v. Ives*, 129 F.3d 209 (1st Cir. 1997), the plaintiff grandfather filed a § 1983 action after a state case agent identified him as an "untreated sex offender" in connection with child protection proceedings. The plaintiff claimed that this accusation, made without the benefit of a thorough investigation, deprived him of his right to maintain contact with his grandchildren and violated (among other things) his due process rights of family integrity. The First Circuit Court of Appeals affirmed the district court's dismissal, on qualified immunity grounds, of the lawsuit, concluding that, even if the plaintiff possessed a constitutionally protected interest in visitation with his non-resident grandchildren, the plaintiff had proffered "no precedent to show that the circumstances of his case come even close to a due process violation," based on the facts involved.

129 F.3d at 212.

Although the *Brown* court was willing to indulge in an assumption of the asserted constitutional right for purposes of its discussion, it expressed some skepticism on the point. The court recognized that, in *Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993), it had spoken of the possibility that grandparents may, in certain cases, have some constitutionally protected rights in associating with their grandchildren. Significantly, however, the *Brown* court pointed out that its remarks in *Watterson* had been limited to grandparents who were residing with the grandchildren, *see* 129 F.3d at 211 (*citing Watterson*, 987 F.2d at 8 n.6); "[p]rotection of nonresident grandparents," the court noted, "has an even slimmer pedigree in the case law." *Id*. (citing cases).

Two Circuit Courts of Appeals, however, have ruled that even non-resident grandparents possess a constitutionally protected liberty interests in participating in the upbringing of their grandchildren. In *Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002), the Sixth Circuit considered the constitutionality of an ordinance which banned individuals arrested for or convicted of drug crimes from entering certain areas designated as "drug exclusion zones." Because of her prior arrest on marijuana trafficking charges, the plaintiff, Patricia Johnson, was prohibited from entering a particular drug exclusion zone where one of her daughters and five of her minor grandchildren resided and attended school. Prior to her arrest, the plaintiff had helped care for her five grandchildren and had regularly taken two of them to school, although she had not lived with the family. Following her exclusion from the zone, she was discovered there by city officials and charged with criminal trespass. That charge was eventually dismissed and Mrs. Johnson later filed a lawsuit alleging that the ordinance infringed upon, among other things, her constitutional right to freedom of association.

The question confronted by the Sixth Circuit Court of Appeals in *Johnson* was "whether a grandmother has a fundamental freedom of association right to participate in the upbringing of her grandchildren." 310 F.3d at 500. The court opined that prior circuit precedent, as set forth in *Thompson v. Ashe*, 250 F.3d 399 (6th Cir. 2001),

counseled against recognizing a fundamental right on the part of grandparents to merely *visit* their grandchildren. In *Thompson*, the Sixth Circuit had rejected the plaintiff's constitutional challenge to a "no trespass" list that had barred the plaintiff from visiting family members in a public housing development, stating that the Supreme Court's recognition of an associational right of cohabitation with relatives "has not [been] extended ... to mere visitation with family members." *Thompson*, 250 F.3d at 406-07. Notwithstanding this, however, a majority of the panel in *Johnson* ruled that the plaintiff grandmother *did* have a fundamental associational interest in participating in the *education and rearing* of her grandchildren, reasoning that "*Thompson* itself recognized the distinction between participating in child rearing and merely visiting one's family." *Johnson*, 310 F.3d at 501. The majority stressed that Mrs. Johnson had been actively involved in the lives and activities of her grandchildren with their mother's support and consent, a fact which distinguished Mrs. Johnson from the plaintiff in *Thompson*. *See id.* The *Johnson* majority further concluded that, to the extent *Thompson* dictated a contrary result, that decision "conflicts with Supreme Court precedent and cannot bind this court." *Id.* (*citing Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510 (1925) and *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

The Tenth Circuit Court of Appeals has gone further by recognizing a "clearly established" constitutional right to familial association as between grandparents and their grandchildren. In *Suasnavas v. Stover*, 196 Fed. Appx. 647, 2006 WL 2458678 (10th Cir. Aug. 25, 2006), the plaintiffs were Angela Suasnavas, the natural daughter of plaintiff Margaret Luethje and the step-daughter of plaintiff Arnold Luethje, and Evie Burris, the natural daughter of the Luethje's and Angela Suasnavas' half-sister. Angela Suasnavas was the mother of a child named Shari Kay Phillips, whom Suasnavas had sometimes left in the Luethje's care. Evie Burris likewise had children whom she had occasionally entrusted to her parents. The plaintiff's § 1983 lawsuit arose out of a series of state court child welfare proceedings involving various officials from the

Oklahoma Department of Human Services during which, according to the complaint, the defendants had (i) falsely accused Arnold Luethje of having sexually molested Suasnavas when she was a child, (ii) removed Phillips from Suasnavas' custody based on false accusations that Suasnavas had endangered her daughter by leaving her in the Luethjes' home, and (iii) threatened Burris and Suasnavas that their children would be taken from them and/or not returned if either woman continued to associate with the Luethjes or entrust them with the children. The plaintiffs alleged that these actions had deprived them of their right to associate with other members of their family.

On the defendants' appeal from the district court's denial of qualified immunity, the Tenth Circuit Court of Appeals affirmed and held, in relevant part, that the Luethjes had a constitutionally protected liberty interest in associating with their grandchildren that was clearly established at the time of the defendants' challenged conduct. In arriving at this ruling, the *Suasnavas* court relied on the Tenth Circuit's prior decision in *Trujillo v. Board of County Commissioners*, 768 F.2d 1186 (10th Cir. 1985), a case in which the plaintiff mother and her adult daughter claimed that they had been deprived of their constitutional right of familial association with their adult son/brother by virtue of his wrongful death while incarcerated at the Santa Fe County Jail. The *Trujillo* court had recognized a liberty interest in familial relationships that would encompass adult siblings, stating that "[m]any courts have recognized liberty interests in familial relationships other than strictly parental ones." *Trujillo*, 768 F.2d at 1188 (citing cases). Indeed, the *Trujillo* court declined to set the boundary of familial association at sister-brother relationships, noting

> ...that the familial relationships in this case do not form the outer limits of protected intimate relationships. As the Court in [*Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S. Ct. 3244 (1984)] further explained, "a broad range of human relationships ... may make greater or lesser claims to constitutional protection ...," requiring "a careful assessment of where [a particular] relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." 104 S. Ct. at 3251. Those characteristics which would indicate a protected association include smallness, selectivity, and seclusion. *Id*. at 3250. We need not make such an assessment here, since the relationships at issue clearly fall within the protected range.

20

768 F.2d at 1189 n.5.[4]

Insofar as the Luethje's relationship with their grandchildren was concerned, the Tenth Circuit agreed with the district court's finding that the complaint alleged the violation of a clearly established substantive due process right. "Although *Trujillo* did not explicitly recognize a right of familial association between grandparents and grandchildren," the court wrote,

> we made it clear in *Trujillo* that the right of familial association extends beyond the context of 'parent, spouse, or child,' *Trujillo*, 768 F.2d at 1190, and we cited specific legal authority recognizing the importance of the familial relationship between grandparents and grandchildren, *id.*, at 1188 (citing *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S. Ct. 1932, 52 L.Ed. 2d 531 (1977) (plurality opinion) (zoning ordinance could not prohibit grandmother from living with her grandsons who were cousins), and *Drollinger v. Milligan*, 552 F.2d 1220, 1226-27 (7th Cir. 1977) (deprivation of grandfather's relationship with grandchild actionable under § 1983)).

196 Fed. Appx. at 657, 2006 WL 2458678 at **9. Accordingly, the *Suasnavas* court concluded, "*Trujillo* gave defendants 'fair warning that their [alleged] conduct was unconstitutional.'" *Id*. (alteration in the original).

As the foregoing survey of case law demonstrates, the various circuit courts of appeals have not been uniform in their method of analyzing substantive due process claims involving asserted liberty interests on the part of grandparents or other extended family members relative to their minor kin. Nevertheless, certain common themes seem to figure prominently in the cases, most notably the courts' emphasis on whether the plaintiff was a custodial figure or otherwise acting in loco parentis to the children at the

---

[4] Despite a willingness to recognize the asserted liberty interest in brother-sister association, the *Trujillo* court affirmed the lower court's dismissal of the claim because the plaintiffs had failed to allege an intent on the part of the defendants to deprive them of their protected relationship with their brother/son. Thus, under Tenth Circuit law, the right to recover damages under § 1983 for alleged deprivations of the right of intimate association is limited by the requirement that there be an allegation of intent to interfere with a particular relationship. *See Suasnavas*, 196 Fed. Appx. at 656; 2006 WL 2458678 at **7.

time of the state's involvement in their lives; whether and for how long the children had been residing with the plaintiff prior to state intervention; whether the plaintiff has a biological link to the children; whether there is a potential conflict between the rights of the plaintiff and the rights or interests of the children's natural parents; and whether the plaintiff has any rights or expectations relative to the children under relevant state law.

Based on the foregoing authorities, I conclude that Rees lacks any constitutionally protected liberty interest in associating with her granddaughters. Insofar as her relationship to her younger granddaughter Ruby is concerned, Rees is in a position somewhat similar to the plaintiffs in *Mullins*, *supra*, where, at the time of the state's involvement in their lives, the grandparents' most significant link to their grandchildren was biological. The complaint alleges that, in the time leading up to OCY's investigation into neglectful conditions in Carrie Peterson's home, Ruby had been withheld from Rees's custody on the basis of her disputed paternity. There is no allegation of a significant emotional, financial, or custodial history as between Rees and Ruby prior to the time the children were removed from their mother's home. As with the *Mullins* plaintiffs, the interest asserted here is in "a potential, still undeveloped familial relationship with [a] prospective adopted child[ ]." 57 F.3d at 794. Yet "[a] negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth." *Id*. (citation omitted).

Rees's relationship to her older granddaughter Pearl presents a closer call. On one hand, certain factors are present here that weigh in favor of recognizing a fundamental liberty interest on the part of Rees relative to the custody, care and management of Pearl. Beyond Rees's biological relationship to her granddaughter, she has alleged that the two spent significant time together to the extent that, at one point, Rees had cared for Pearl over a period of seven months with the agreement of the child's parents prior to the County's involvement in their lives. In addition, given the mother's unavailability to the children and the subsequent termination of her parental

22

rights coupled with the father's premature death, this case does not present a situation where the rights of the natural parents were in serious conflict with Rees's interest in taking custody of Pearl.

Nevertheless, certain countervailing factors are also present in this case which, in my opinion, have dispositive importance. Most significantly, this is not a case in which Rees had physical or legal custody of Pearl at the time that the Defendants commenced their child welfare proceedings. (*See* Complaint ¶ 18 ("Pearl Dombrowski had spent significant time with and was cared for by Plaintiff over a period of seven months prior [to] any involvement by OCY.").) Rather, as Plaintiff's counsel has laudably and candidly clarified, Pearl had been returned to her mother's custody for a period of 1 or 2 months prior to her removal from Carrie Peterson's home, and Ms. Peterson was therefore the children's legal guardian and custodian at the time of the agency's intervention. After being removed from their mother's home, both children, according to the complaint, were placed in an OCY foster home where they remained following the juvenile court's determination that a return to their mother's residence would be contrary to the children's welfare. Thus, there is no allegation that Rees was acting *in loco parentis* to Pearl[5] or as her custodian at the time the agency became

_____

[5] The Pennsylvania Supreme Court has defined *in loco parentis* status as follows:

> The phrase "in loco parentis" refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of in loco parentis embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties.... The rights and liabilities arising out of an in loco parentis relationship are, as the words imply, exactly the same as between parent and child.

*Peters v. Costello*, 891 A.2d 705, 710 ( Pa. 2005) (citation omitted).

involved in their lives, although Rees may have desired that status.  Nor was Rees the only biological relative available to assist with the children, as the complaint alleges that "several members of the Children's biological family wished to care for and/or adopt the Children."  (Complaint ¶ 28.)  Under these circumstances, it is unlikely that Pennsylvania law would have afforded Rees a right of action relative to Pearl, had the child been tortiously injured following OCY's involvement in the case, *see In re D.M.*, 995 A.2d 371, 378 (Pa. Super. 2010) ("*in loco parentis* status provides an individual with the same rights as a parent), and Rees would have had no right under Pennsylvania law to participate in Pearl's dependency proceedings.  *See id.* at 375 (under Pennsylvania's Juvenile Act, participation in dependency proceedings is restricted to "parties," defined as (1) the parents of the juvenile whose dependency status is at issue; (2) the legal custodian of the juvenile; or (3) the person whose care and control of the juvenile is in question); *In re L.C., II*, 900 A.2d 378, 382-83 (Pa. Super. 2006) (grandmother lacked standing to participate in her grandson's dependency proceeding, despite the fact that she had previously cared for the child for many years, where grandmother did not have legal custody or in loco parentis status at the time of the events giving rise to the dependency proceedings, and the grandmother's care, custody and control were not at issue).

.       I find that these circumstances collectively weigh against recognition of a fundamental liberty interest on the part of Rees.  Like the situation in *Miller*, and quite unlike the situations in *Moore*, *Ellis*, and *Rivera*, "there was no existing family unit of which [the plaintiffs] were a part that [the Defendants] sought to break asunder; the grandchildren were, in fact, wards of the [county] at all relevant times."  *Miller*, 355 F.3d at 1176.  While *Moore* clearly recognizes a protected liberty interest for extended family members to reside together where matters of custody and child welfare are not at issue, that principle does not control the outcome of this case which presents materially distinguishable facts.

Although there is little law on the point within this circuit, support for my conclusion can be found in the District Court's decision in *Gordon v. Lowell*, 95 F. Supp. 2d 264 (E.D. Pa. 2000).  In that case, the plaintiffs were the biological grandmother and non-biological step-grandfather of a 7-year old girl who was declared a dependent of the court following her mother's arrest.  Having been declared a dependent, the child came under the legal custody of Berks County Children and Youth Services and was initially placed by that agency with the plaintiffs, who had previously cared for her for a period of six months when she was 2 years old.  After the plaintiffs voluntarily relinquished custody of the child back to CYS, she was placed in foster care but the plaintiffs maintained visitation.   Eventually, the child was adopted by her foster parents with the recommendation of a court-appointed therapist.  Although the plaintiffs never tried to adopt the girl, they later filed suit against Berks County, CYS, and certain of its employees, claiming that the agency had actively discouraged the plaintiffs' relationship with the child and, in the process, violated their due process rights (among others).

On review of the defendants' Rule 56 motion, the U.S. District Court for the Eastern District of Pennsylvania granted summary judgment in favor of the defendants, ruling, in relevant part, that the plaintiffs lacked any constitutionally protected liberty interest in the care, custody, and management of their grandchildren.  95 F. Supp. 2d at 269-70.  The court acknowledged the "long-recognized fundamental liberty interest" which parents have in the care, custody and management of their children as protected by substantive due process principles, *id*. at 269, but it ruled that this protection is limited to parents.  *See id.* at 269 ("Grandparents have no similar liberty interest under the Fourteenth Amendment, and are therefore accorded no constitutional protection.") (citing *Mullins v. State of Oregon*, *supra*, at 797).

To the extent my conclusion as to Rees's lack of a constitutionally protected liberty interest is contradicted by the decisions of the Sixth and Tenth Circuits in *Johnson* and *Suasnavas*, I decline to follow those rulings.

25

In *Johnson*, it will be recalled, the court distinguished between the idea of a fundamental associational right to merely visit one's family verses an associational right to participate in child-rearing, giving recognition to the latter but not the former.  *See* 310 F.3d at 501.  The Sixth Circuit found support for such a right in *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (striking down Oregon's Compulsory Public Education Act, which mandated attendance at public schools for children between the ages of 8 and 16 and finding that the statute "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"), and *Meyer v. Nebraska*, 262 U.S. 390 (1923) (striking down as unconstitutional a state law prohibiting the teaching of any subject in any language other than the English language in any school, or the teaching of languages other than the English language below the eighth grade).

More persuasive, in my view, is the dissenting opinion authored by Judge Gilman, who would have held that nonresident, noncustodial grandparents like Mrs. Johnson lack a fundamental liberty interest in visiting or assisting in the upbringing of their grandchildren.  In Judge Gilman's view, the majority's reliance on *Moore v. East Cleveland*, as well as *Pierce* and *Meyer*, to support the existence of such a right was misplaced.  As Judge Gilman explained,

> Where grandparents reside with their grandchildren, as was the case in *Moore*, the circumstances are such that recognizing the grandparents' right to live in that household is a logical outgrowth of relevant Supreme Court precedent.  Recognizing the right to visit grandchildren as a fundamental liberty interest, in contrast, represents an expansion of previously recognized fundamental rights and presents the risk of imposing this court's policy preferences in the guise of Due Process.

310 F.3d at 514 (*citing Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).  As for the Supreme Court's rulings in *Pierce* and *Meyers*, Judge Gilman viewed these as "cases recognizing that *parents or guardians* have a fundamental right 'to direct the education and upbringing of one's children.'"  *Id*. (citation omitted) (emphasis in the original).  As Judge Gilman explained, "[n]one of the pertinent Supreme Court cases ...

involve the right of *nonresident grandparents* to contribute to the raising of their grandchildren." *Id*. (citing *Pierce, supra* and *Meyers, supra*) (emphasis in the original). *Moore*, he noted, "focused on the possibility that grandparents who live with their grandchildren might assist in raising them, but it did not address the rights of a nonresident grandparent." *Id*. In sum, then, because Mrs. Johnson neither lived with nor acted as the guardian of her grandchildren, Judge Gilman viewed her relationship with her grandchildren as "distinguishable from the situations that actually existed or were contemplated in *Moore*, *Pierce*, *Meyer*, and other cases upon which the majority relies." *Id*. Because I find Judge Gilman's analysis more persuasive than that of the *Johnson* majority, I am not inclined to follow the majority's ruling.

I am similarly unpersuaded by the reasoning of the Tenth Circuit Court of Appeals as set forth in *Suasnavas, supra*. In that case, the court's analysis relative to the associational rights of the grandparents was brief, but the court did indicate its reliance on *Trujillo v. Board of County Commissioners*, 768 F.2d 1186 (10th Cir. 1985), and two cases cited therein – *Moore*, *supra*, and *Drollinger v. Milligan*, 552 F.2d 1220, 1226-27 (7th Cir. 1977) – which the *Suasnavas* court described as "specific legal authority recognizing the importance of the familial relationship between grandparents and grandchildren." 196 Fed. Appx. at 657, 2006 WL 2458678 at **9. *Trujillo*, however, did not involve the rights of grandparents at all, and, for reasons previously discussed, I do not agree with the suggestion that *Moore* supports recognition of the type of liberty interests asserted either in *Suasnavas* or in this case. As for *Drollinger*, that was a case wherein the Seventh Circuit Court of Appeals held that a grandfather had an actionable § 1983 claim relative to state conduct which allegedly deprived him of his relationship with his granddaughter. *See* 552 F.2d at 1226-27. However, *Drollinger* has been criticized by the Ninth Circuit Court of Appeals in *Miller*, *see* 355 F.3d at 1175-76 (commenting that *Drollinger* is "not helpful" in that the court "never explained its decision"), and the Seventh Circuit has itself questioned *Drollinger's* precedential value. *See Ellis*, 669 F.2d at 513-14 (after acknowledging *Drollinger*, the court references the

"absence of compelling authority for holding that grandparents ... ever have a liberty interest under the due process clause," but then goes on to assume the existence of such a right on the part of a custodial grandmother).

In sum, the conclusion that Rees lacked any substantive due process right relative to her associational interest with her granddaughters is, in my view, consistent with the prevailing position among the federal courts of appeals. I also consider this result to be consistent with the Supreme Court's admonition that courts should proceed cautiously when entertaining claims that would broaden the scope of substantive due process protection. As the Court has previously stated,

> [W]e "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S., at 125, 112 S. Ct., at 1068. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," *ibid.*, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court, *Moore*, 431 U.S., at 502, 97 S.Ct., at 1937 (plurality opinion).

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). See also *Nunez* 578 F.3d 228, 232 (3d Cir. 2009) (noting that courts have been "reluctant to expand" the constitutional right of privacy). *Accord Johnson,* 310 F.3d at 508 (Gilman, J., dissenting) ("I believe that this court, like the Supreme Court, must proceed with caution before expanding previously recognized liberty interests to encompass situations that have not yet been encountered."). For all of these reasons, I conclude that Count I of the Complaint does not state a viable cause of action under § 1983 because it fails to allege the deprivation of a substantive due process right.

2.    Count II of the Complaint

In Count II of her complaint, Rees alleges that the Defendants collectively violated her rights under the Due Process Clause by denying her equal access to the courts. Although the complaint does not elaborate on this theory, it is clear from Rees's

brief in opposition to the pending motion that her claim is intended to be construed as a procedural due process claim.

When analyzing a procedural due process claim, a court's first step is to determine whether the nature of the interest is encompassed within the Fourteenth Amendment's protection. *Pressley v. Blaine*, No. 08-1517, 352 Fed. Appx. 701, 705, 2009 WL 3842753 at **3 (3d Cir. Nov. 18, 2009) (*citing Fuentes v. Shevin*, 407 U.S. 67 (1972)). Once it is determined that the interest is protected, the question becomes what process is due to protect it. *Id*. (*citing Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). *See also Solomon v. Philadelphia Housing Authority*, 143 Fed. Appx. 447, 452, 2005 WL 1805616 at **4 (3d Cir. Aug. 2, 2005) (explaining the "bifurcated" procedural due process inquiry: "We first must determine whether the asserted interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property; if so, we then ask whether the procedures available provided the plaintiff with adequate due process.") (*citing Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)).

Procedural due process rights are triggered by the deprivation of a legally cognizable liberty or property interest. *See Pressley v. Blaine*, 352 Fed. Appx. at 705, 2009 WL 3842753 at **3. Unlike substantive due process rights, which are founded upon "'deeply rooted notions of fundamental personal interests derived from the Constitution,'" *Nunez v. Pachman*, 578 F.3d 223, 233 (3d Cir. 2009) (*quoting Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir. 1995)), the liberty rights protected by procedural due process are somewhat broader and may be created either by state law or by the federal constitution itself. *E.B. v. Verniero*, 119 F.3d 1077, 1105 (3d Cir. 1997) (citing *Sandin v. Conner*, 515 U.S. 472 (1995)).

Nevertheless, "[t]he procedural component of the Due Process Clause does not protect everything that might be described as a "benefit." *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 756 (2005). The Supreme Court has said that "the most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decision-making, ... and, further, by mandating

29

the outcome to be reached upon a finding that the relevant criteria have been met."
*Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462 (1989) (internal citation omitted).  Thus, a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Gonzales*, 545 U.S. at 756 (citing *Thompson, supra*). *See also Fraise v.* Terhune, 283 F.3d 506, 522 (3d Cir. 2002) ("Protected liberty ... interests generally arise either from the Due Process Clause or from [a] state-created statutory *entitlement*.") (citation omitted) (emphasis supplied).

Here, the asserted liberty interest is the right to family integrity.  Rees complains in her brief in opposition to the pending motion that she was not afforded any proper proceeding regarding her suitability as a custodian or as a candidate for the children's adoption.  (*See* Pl.'s Br. in Opp. [9] at p. 16 ("[N]o dependency hearing or any other similar process occurred to determine whether or not Ms. Rees was suitable as a candidate for adoption of the children. .... These denials of procedures, particularly those related to gaining custody of the children in the face of established rights, amount to violations of due process.").)

Rees's allegations, however, do not establish the deprivation of any constitutionally protected liberty interest.  For the reasons previously explained at length, I do not find support in the case law for the proposition that Ms. Rees had a liberty interest in the custody and care of her grandchildren arising from the Fourteenth Amendment itself.

Moreover, while Pennsylvania law does afford grandparents certain rights vis-a-vis their grandchildren, these rights do not support the type of constitutionally protected liberty interest being asserted here.  For example, under § 5311 of what is sometimes referred to as Pennsylvania's Custody and Grandparents Visitation Act, 23 Pa. C.S.A. §§5301 *et seq.*, when a child's parents are deceased, the parent of the deceased parent may petition the court for partial custody or visitation relative to the child.  See 23

Pa. C.S.A. § 5311.[6]  Thus, Pennsylvania law conferred upon Rees standing to petition

the court to seek partial custody over her granddaughters and/or visitation with them,

given her son's death.  Similarly, under § 5313 of the Act, Rees had standing to petition

for physical and legal custody of the girls in light of the court's dependency ruling.  *See*

23 Pa. C.S.A. § 5313(b)[7]; *R.M. v. Baxter*, 777 A.2d 446, 448 (Pa. 2001) (holding that

§ 5313 conferred automatic standing upon a grandparent to seek physical and legal

custody of a grandchild following an adjudication of dependency).  In addition, the

Pennsylvania Supreme Court has recognized the right of noncustodial grandparents to

intervene in an adoption proceeding in order to assert their own custodial interests in

---

[6] Section 5311 states:

> If a parent of an unmarried child is deceased, the parents or grandparents
> of the deceased parent may be granted reasonable partial custody or
> visitation rights, or both, to the unmarried child by the court upon a finding
> that partial custody or visitation rights, or both, would be in the best
> interest of the child and would not interfere with the parent-child
> relationship. ...

23 Pa. C.S.A. § 5311.

[7] Section 5313 provides, in relevant part, that:

> A grandparent has standing to bring a petition for physical and legal
> custody of a grandchild.  If it is in the best interest of the child not to be in
> the custody of either parent and if it is in the best interest of the child to be
> in the custody of the grandparent, the court may award physical and legal
> custody to the grandparent. This subsection applies to a grandparent:

> (1) who has genuine care and concern for the child;

> (2) whose relationship with the child began with the consent of a parent of the
> child or pursuant to an order of court; and

> (3) ... who assumes or deems it necessary to assume responsibility for a child
> who is substantially at risk due to parental ... neglect... .

23 Pa. C.S.A. § 5313(b).

31

their grandchildren, notwithstanding the termination of the natural parents' rights in the children and despite the objections of the family service agency. *See In re Adoption of Hess*, 608 A.2d 10, 12 (Pa. 1992).

These "rights," however, do not amount to a constitutionally protected interest in family integrity, nor do they guarantee any particular outcome relative to the grandparent's custody, visitation or adoption request. In any case, the state trial court has the authority to grant or deny the grandparent's request as the best interests of the child dictate. *See* § 5311 (allowing reasonable partial custody or visitation rights to grandparents conditioned upon a court finding that such partial custody and/or visitation "would be in the best interest of the child and would not interfere with the parent-child relationship"); § 5313(b) (permitting the court to award physical and legal custody to the grandparent "if it is in the best interest of the child" to be with the grandparent rather than with either parent); *In re Adoption of Hess*, 608 A.2d at 226 (noting "it is clear from [Pennsylvania's Adoption] Act that the court's concern [in adoption proceedings] is not the will of the agency but the best interests of the child"). Thus, the rights which Pennsylvania law affords grandparents to petition for custody or visitation do not create the type of entitlement which gives rise to a protected liberty interest for federal due process purposes. *See Faust v. Messinger*, 497 A.2d 1351, 1353 (Pa. Super. 1985) (plaintiff's entitlement merely to *seek visitation* with her grandchild pursuant to the Custody and Grandparents Visitation Act "does not amount to one which must be protected by the due process clause.").

Even if the foregoing state law provisions did create rights entitled to protection under the federal due process clause, however, Rees has not alleged an actionable deprivation of those rights. Despite the fact that Rees had standing to petition for custody and/or visitation rights with her granddaughters, she never filed a petition in that regard. According to the complaint, she eventually abandoned her efforts to obtain custody through a kinship care appointment, and she apparently never attempted to adopt the children.

At oral argument Rees's counsel refined her theory somewhat by claiming that the Defendants, in effect, prevented her from filing custody and/or visitation petitions, thus interfering with her right to access the courts. It is alleged that the Defendants accomplished this by baiting Rees into pursuing the kinship care process, all the while knowing that they would never support her appointment as a placement source.

Even accepting this averment as true, however, I still find that Rees's legal theory fails to state a viable constitutional tort. "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Woodford v. Ngo*, 548 U.S. 81, 122 (2006). To state a claim for denial of access to the courts, a plaintiff must demonstrate "actual injury," meaning the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" *Beckerman v. Susquehanna Twp. Police & Admin.*, 254 Fed. Appx. 149, 153 (3d Cir. 2007) (citation omitted) (alteration in the original). *See also Roberts v. Mentzer*, No. 09-3251, 2010 WL 2113405 at *2 (3d Cir. May 27, 2010). Here, despite the suggestion of Rees's counsel that she was baited into foregoing her rights under the Custody and Grandparent Visitation Act, it is acknowledged that Rees had access to other legal counsel during this same time period and that she retained an attorney at least for limited purposes related to her efforts to obtain custody. Moreover, notwithstanding the suggestion that Reese was duped into foregoing a separate legal proceeding in favor of the kinship care process, it is clear from her allegations that she became disillusioned with that process no later than September of 2008 when she began to take matters into her own hands by filing the first of two grievances against the agency. This occurred within approximately six weeks after Carrie Peterson's parental rights had formally been terminated and prior to the children's adoption. Under these circumstances, Rees cannot establish that the Defendants denied her access to the courts.

Although Rees has cited no precedent to support her denial-of-access-to-the-courts claim, this Court has located one potentially instructive opinion. In *Whisman v.*

*Rinehart*, 119 F.3d 1303 (8th Cir. 1997), the Eighth Circuit Court of Appeals ruled that the plaintiff grandparents stated a viable § 1983 claim against certain juvenile officers and county social workers based on allegations that the plaintiffs had been denied, without due process of law, their right to intervene in state juvenile court proceedings relative to their grandson.  In that case, the defendants had taken custody of a mother's young son for a period of seventeen days, during which time neither the child's mother nor his grandparents were afforded a hearing concerning the propriety of the detention. Although the defendants had allegedly been notified on the day of the child's removal that the mother consented to signing custody over to her parents, the defendants allegedly held the child for the first twelve days without the benefit of any filed court order authorizing the detention.  Although the *Whisman* court appears not to have sanctioned the plaintiff's claim that they had a fundamental liberty interest in the custody of their grandchild, *see generally* 119 F.3d at 1311-12, the court did recognize a viable cause of action based on the alleged denial of the plaintiffs' clearly established right under Missouri law to petition the juvenile court for custody of their grandson. Critical to the court's ruling was the fact that the defendants had allegedly intentionally failed to initiate juvenile court proceedings for a period of twelve days, during which time the grandparents were powerless to exercise their right of intervention.  As the court explained, "[t]he Missouri statute did not authorize grandparents to initiate any custody proceeding"; instead, the statute merely "authorized [the plaintiffs'] intervention and defendants blocked such right by refusing to act to initiate the proceeding."  *Id.* at 1313.

    To the extent the *Whisman* case is instructive here, I find it to be materially distinguishable from the case at bar.  In this case, there is no allegation of circumstances that functionally prohibited Rees from exercising her right to independently petition the court for custody and/or visitation rights.  At all relevant times, those legal avenues remained open to her.  Moreover, despite counsel's representations that Rees was baited into foregoing those options, it is clear from her own allegations that she retained legal counsel during this period relative to her

34

interests in the children.  Under these circumstances, I find *Whisman* to be distinguishable and I find Rees's allegations insufficient to establish a viable denial-of-court-access claim.

Rees's due process claim also appears to be premised on nebulous rights supposedly guaranteed by the federal Adoption and Safe Families Act and the County's Kinship Care Policy.  On further questioning by the Court, however, Plaintiff's counsel acknowledged that he could not point to any specific provision within these sources which establish the existence of a particular right violated by the Defendants.  Moreover, counsel forthrightly acknowledged that these sources were cited in the complaint primarily because they had been cited in general fashion by Cynthia Gariepy, an agent of the Pennsylvania Department of Public Welfare, in connection with the Department's investigation into Rees's administrative grievances.  It goes without saying, however, that Ms. Gariepy's belief that the Defendants violated a particular statute or policy does not, by itself, establish a due process violation, particularly in the absence of any citation to a specific provision that might fairly be said to have created an entitlement worthy of constitutional protection.  Significantly, Rees has cited no provision within these authorities that mandates a particular outcome upon the finding that certain "relevant criteria have been met."  *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. at 462.  Accordingly, she has failed to allege a constitutionally protected liberty interest to which procedural due process protection can attach.

Finally, Rees states in her brief in opposition that she was also denied any proceeding "to handle the complaints alleged in her two grievances."  (Br. in Opp. [9] at p. 16.)  I do not construe this passing allegation as a separate basis for the assertion of a due process violation.  To the extent it is, however, it fails to state a legally cognizable claim.  Fundamentally, such a claim fails to identify any underlying liberty or property right which is supposedly clothed with constitutional protection.  No entitlement is identified that arises to the level of a constitutionally protected interest.  *See Whisman*, 119 F.3d at 1312 ("Constitutional significance may attach only to certain interests

35

created by state law and it is clear that not every transgression of state law may do double duty as a constitutional violation.").

## B.

Even if Rees's claims did not fail on their own merits, they would have to be dismissed as against the individual Defendants under the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, ---U.S. ----, 129 S. Ct. 808, 815 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity applies regardless of whether the official's conduct results from a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact. *Montanez v. Thompson,* 603 F.3d 243, 250 (3d Cir. 2010).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Montanez,* 603 F.3d at 251 (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Because this inquiry focuses on the official's actual situation, the analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition....'" *Id. (quoting Saucier*, 533 U.S. at 201) (ellipsis in the original). Our analysis therefore "turns on the 'objective legal reasonableness of the [official's] action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* (*quoting Pearson*, 129 S. Ct. at 822). Immunity should be granted so long as "the law did not put the officer on notice that his conduct would be clearly unlawful." *Id.* (citing *Bayer v. Monroe County Children and Youth Serv.*, 577 F.3d 186, 193 (3d Cir. 2009). In this manner, the "qualified immunity analysis 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citations omitted).

Insofar as Count I of the complaint is concerned, there is no controlling law within the Third Circuit concerning grandparents' substantive due process rights, if any, relative to the custody and care of their non-resident grandchildren.  The one pertinent district court which I have located, *Gordon v. Lowell*, *supra*, holds that grandparents do not possess such rights.  *See* 95 F. Supp. 2d at 269 (holding that grandparents had no constitutionally protected liberty interest in the care, custody or control of their granddaughter for purposes of their due process claim).  The primary Supreme Court case relied on by Rees, *Moore v. City of East Cleveland, supra*, is materially distinguishable in that it addresses the living arrangements of a pre-existing family unit where matters of child welfare and custody were not at issue and, therefore, it does not control the outcome of this case.

As for the other circuit court decisions which touch on this issue, the rulings have been mixed.  The Ninth Circuit Court of Appeals has held that the mere biological link which grandparents share with their grandchildren is insufficient to invoke due process protection.  *See Mullins*, 57 F.3d at 794.  That court has further held that, even where grandparents have been accorded "de facto parent" status under state law and have acted as past custodians of the children, due process principles might not afford them a right to continued contact with the grandchildren.  *See Miller*, 355 F.3d at 1176-77.  Three courts of appeals have held or suggested that *resident* grandparents or other extended family members may have protected liberty interests in the custody and/or society of the minor relatives in their care, particularly where the plaintiff caregiver is acting *in loco parentis*.  *See Ellis*, 669 F.2d 512-14; *Rivera,* 696 F.2d at 1024-25; *Brown,* 129 F.3d at 211.  However, these authorities are not helpful to Rees, since they involved situations that are materially distinguishable from this case.

As I have previously discussed, the Sixth and Eighth Circuits have each rendered opinions which can be read as supporting the rights which Rees asserts in the present action.  *See Johnson, supra; Suasnavas, supra*.  However, it would not have been clear to a reasonable officer confronting the circumstances of this case that the

Third Circuit Court of Appeals would follow the rulings of *Johnson* and *Suasnavas* or that the holdings of those opinions would govern the outcome of this situation. Accordingly, the individual Defendants are entitled to qualified immunity relative to Count I of the complaint.

I reach the same conclusion with respect to Rees's due process claim based on lack of access to the courts under Count II. Rees has provided no relevant precedent showing that her theory of liability was clearly established law within the circuit and I have found none. The one case which is arguably instructive, *Whisman, supra*, is not binding authority within this circuit and is materially distinguishable in any event for the reasons previously discussed. Although the constitutional right of access to courts may itself have been well established within the Third Circuit, our inquiry focuses on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Montanez,* 603 F.3d at 251 (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Focusing, therefore, on the specific context of this case – including the fact that Rees had the right under state law to petition for visitation or custody, that she had access to legal counsel during this time, and that she eventually abandoned the kinship care process of her own volition, I cannot say that a reasonable officer would have known that he or she was violating clearly established rights by engaging in the conduct alleged in the complaint. Accordingly, even if Rees did possess the constitutional rights she asserts, the individual Defendants are entitled to the protection of qualified immunity relative to the claims in Counts I and II of the complaint.[8]

---

[8] The individual Defendants have alternatively claimed that they are entitled to absolute immunity relative to their involvement in any juvenile court proceedings involving determinations as to dependency and placement of the children. Although we technically need not address this argument, Defendants Jones, Valimont and Vogt are correct that they enjoy absolute immunity relative to their respective conduct on behalf of OCY in preparing for, initiating, and prosecuting dependency proceedings and/or proceedings to terminate the parental rights of Carrie Peterson. *See generally Ernst v. Child and Youth Services of Chester County*, 108 F.3d 486, 495 (3d Cir. 1997) (holding that CYS defendants were entitled to absolute immunity for their actions on behalf of

C.

In Count VIII of her complaint, Rees has asserted a municipal liability claim under § 1983 against OCY.  Fundamentally, Rees's claims against OCY fail as a matter of law because, given the facts contained in the complaint, no predicate constitutional violation has been alleged.  *See Bittner v. Snyder County, PA*, 345 Fed. Appx. 790, 792-93, 2009 WL 3022133 at **2 (3d Cir.  Sept. 23, 2009) ("It is well settled that before a municipality may be found liable under § 1983, there must be a constitutional violation.") (*citing Monell, supra,* 436 U.S. at 694).

Moreover, even assuming the existence of an underlying constitutional tort, Rees has failed to sufficiently allege liability on the part of OCY.  "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (*citing Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978)).

For purposes of § 1983 liability, a municipality may be liable for either its policy or custom:

> A government policy or custom can be established in two ways.  Policy is made when a decisionmaker possessing final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanently and well-settled as to virtually constitute law.

*McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir.2009) (citations, internal quotation marks, and brackets omitted).  "Custom requires proof of knowledge and acquiescence by the decisionmaker."  *Id.*

---

the state in preparing for, initiating, and prosecuting dependency proceedings, including their formulation and presentation of recommendations to the court).  Accordingly, to the extent Rees's claims are premised on such conduct by the individual Defendants, the latter are protected by absolute immunity.

Here, there has been no allegation that the individual Defendants' alleged misconduct was carried out pursuant to any officially adopted policy, regulation or decision. Quite to the contrary, Rees has alleged that the individual Defendants' misconduct – i.e., their "refusal to allow Plaintiff or any other member of the Children's family to care for or adopt the Children" (Complaint ¶ 29) – directly violated the County's official policy of pursuing kinship care placement. (*See* Complaint ¶ 30 ("Said refusal was in direct violation of the Kinship Care Policy of OCY...").) In other words, Rees's allegations suggest that, if the individual Defendants had followed OCY's official kinship care policy, they would have placed the children in Rees's care as she wished.

Rees's municipal liability claim is better understood as alleging the existence of an unofficial custom or practice which was the "moving force" behind her injury. *See Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000) ("Once a § 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.") (internal quotation marks and citation omitted). To that end, she alleges that "[a]t all times relevant hereto, Defendant OCY developed and maintained policies or customs that exhibited deliberate indifference to the Constitutional rights of individuals that directly resulted in the deprivation of Plaintiff's constitutional rights." (Complaint ¶ 133.) "Alternatively," she claims, "Defendant OCY failed to enforce said policies that were intended to protect Plaintiff and those similarly situated." (*Id*. at ¶ 134.) However, such boilerplate allegations, which merely parrot the standard for § 1983 liability, are insufficient. *See McTernan*, 564 F.3d at 658 ("To satisfy the pleading standard, McTernan must identify a custom or policy, and specify what exactly that custom or policy was.") (citation omitted) (holding that complaint, which gave no notice as to the defendants' improper conduct, was not sufficient where it merely alleged that the plaintiff's rights were violated "due to the City's policy of ignoring First Amendment rights"); *Muller v. Bristol Township*, Civil Action No. 09-1086, 2009 WL 3028949 at *4 (E.D. Pa. Sept. 17, 2009) (allegation of municipal liability which was little more than a

recitation of § 1983 itself was insufficient, as a "[f]ormulaic recitation of the elements of a cause of action will not do") (alteration in the original) (quoting *McTernan*, 564 F.3d at 659).

Rees's more substantive allegations of municipal liability are as follows:

135. Defendant OCY failed to properly staff, train and supervise caseworkers with regard to processing requests under the Kinship Care Policy and Adoption and Safe Families Act of 1997.

136. Defendant OCY maintained a policy or custom of failing to adhere to written standards for the agency's operation with regard to requests made, under the Kinship Care Policy and Adoption and Safe Families Act of 1997.

137. It was the practice, policy and/or custom of Defendant OCY to tolerate, enable and/or fail to correct caseworker and supervisor non-compliance with policies and procedures set forth regarding the handling of requests under the Kinship Care Policy and Adoption and Safe Families Act of 1997 by caseworkers and their supervisors.

138. It was the practice, policy and/or custom of Defendant OCY to tolerate, enable[ ] and/or encourage a pattern of incompetent, dysfunctional and grossly negligent handling of requests under the Kinship Care Policy and Adoption and Safe Families Act of 1997 by caseworkers and their supervisors.

(Complaint ¶¶ 135-138.) These allegations might go a long way toward establishing a municipal liability claim if generic violations of the underlying Kinship Care Policy and Adoptions of Safe Families Act amounted to a constitutional tort; however, as I have previously discussed, they do not. Accordingly, Rees has failed to allege the existence of a policy or custom for municipal liability purposes.

Also lacking is any allegation that an official with final policy-making authority established the alleged custom or policy. Notably, the named individual Defendants – a caseworker, her supervisor, and an attorney representing OCY at court proceedings – were not (and are not alleged to be) decisionmakers possessing final policy-making authority for the agency. The only ostensible policy maker for OCY identified in the complaint – Marianne Daniels, the director of OCY – has not been named as a Defendant in this case and is affirmatively identified only in two paragraphs of the complaint. Paragraph 54 alleges that, "[o]n or about September 12, 2008, Plaintiff filed

a formal grievance against Defendant OCY with [Daniels], and Paragraph 62 alleges that, on or about October 30, 2008, Daniels sent Rees an email "expressing concern about the 'hold up' within OCY concerning Plaintiff's visitation." (Complaint ¶¶ 54, 62.) The actual email, which is appended to the complaint, as Exibit E, indicates that Daniels copied a member of her own staff, as well as Ms. Gariepy from the state agency, in the same email and essentially directed her own staff member to act upon the state agency's directive to facilitate Rees's visitation with her grandchildren. (See Complaint Ex. E [1-2] at p. 29.)

These allegations are insufficient to establish any misconduct on the part of Daniels that could be attributed to OCY as a "policy" or "custom" of deliberate indifference toward the constitutional rights of those serviced by OCY staff. Simply stated, the complaint fails to link the alleged offending "policies" or "customs" to anyone within OCY with policy-making authority. *See McTernan*, 564 F.3d at 659 (where plaintiff did not adequately plead a custom or policy, or a link between the challenged governmental action and a municipal decisionmaker, court found that the allegedly unconstitutional conduct "cannot 'fairly be said to represent official policy,' warranting the imposition of municipal liability") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)); *Wicks v. Lycoming County*, 2010 WL 456776 at *5 (M.D. Pa Feb. 02, 2010) (granting county's motion to dismiss §1983 claim where complaint failed to allege conduct by a municipal decisionmaker); *Rodriguez v. City of Camden*, Civil Action No. 09-cv-1909 (NLH)(KMW), 2010 WL 186248 at *4-5 (D.N.J. Jan. 13, 2010) (plaintiff's allegation against policy-making official, for purposes of establishing municipal liability, were deficient where plaintiff failed to allege facts suggesting that policy-maker effectuated or otherwise approved of an impermissible policy or that he knew of and acquiesced to an improper custom); *Muller v. Bristol Township*, 2009 WL 3028949 at *5 and n. 8 (in suit against township and its police department, allegations were deficient to establish municipal liability where plaintiff failed to allege policy or custom causing his injuries or that the actions were attributable to municipal decision-makers). Accordingly,

Rees cannot establish a viable claim against OCY under a theory of § 1983 municipal liability.[9]

D.

Rees's complaint also includes numerous state law theories of liability, as set forth in Counts III (negligence), Count IV (negligence per se), Count V (gross negligence), Count VI (negligent infliction of emotional distress), and Count VII (intentional infliction of emotional distress). As the parties here are not diverse for purposes of 28 U.S.C. § 1332, the Court's sole basis of jurisdiction over these claim is 28 U.S.C. § 1367, which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." *Id*. at § 1367(c)(3). *See Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (once the District Court dismissed the plaintiff's federal claims, leaving only the state claim, the prerequisites for

---

[9] The exhibits to the complaint demonstrate that, after the State Department of Public Welfare completed its investigation into Rees's grievance, it contacted Daniels by letter to indicate its determination that OCY had violated the Kinship Care Policy and the Adoption and Safe Families Act of 1997. Thereafter, Daniels was required to, and did, submit a plan of correction, which was approved by the state agency. (*See* Complaint Ex. G.) Although these documents might arguably establish Daniels's responsibility, under *respondeat superior* principles, for the alleged deficiencies within her agency, they are insufficient to establish either the existence of a constitutional tort or that the wrongdoing resulted from a sanctioned policy or custom as required for liability under § 1983. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (holding that liability under § 1983 may not be based on a theory of respondeat superior); *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986) (supervisory liability under § 1983 can only be imposed if the supervisory official played an "affirmative part" in the complained-of misconduct; at a minimum, there must be both "(1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate.").

43

§ 1367(c)(3) were met). Accordingly, this Court declines to exercise supplemental jurisdiction over the remaining state law claims and those causes of action will be dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, I conclude that Rees has failed to state a viable § 1983 claim under Counts I, II, and VIII. I find that the complaint fails to allege the deprivation of a constitutional right for purposes of Counts I and II. For the same reason, the complaint fail to state a predicate for municipal liability as against OCY under Count VIII. Alternatively, I conclude that Rees's § 1983 claims against the individual Defendants must fail because the individual Defendants are entitled to qualified immunity as set forth above. I further conclude that Rees's claims against the County are independently insufficient under § 1983 in that they fail to allege that an official policy, practice or custom was the "moving force" behind her injury. Thus, there is no federal cause of action remaining in this case.

As to the remaining state law claims, I decline to exercise supplemental jurisdiction for the reasons set forth above. Accordingly, those claims will be remanded to state court for further adjudication.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BARBARA REES,                    )
                                 )
              Plaintiff,         )
                                 )    Case No. 1:09-cv-283
      v.                         )
                                 )
OFFICE OF CHILDREN AND           )
YOUTH, *et al.*,                 )
                                 )
              Defendants.        )

**O R D E R**

AND NOW, *to wit*, this 30th day of September, 2010, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [4] be, and hereby is, GRANTED in part, as follows:

1.     Said motion is granted with respect to Counts I, II, and VIII of the Complaint; and

2.     In all other respects, the motion is DENIED as moot.

IT IS FURTHER ORDERED that the above-captioned case shall be REMANDED, forthwith, to the Erie County Court of Common Pleas for further proceedings.

                              s/    Sean J. McLaughlin

                              SEAN J. McLAUGHLIN
                              United States District Judge

cc:     All counsel of record.

45